IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:11CV00609 |
| | ) | |
| $94,200.00 in U.S. CURRENCY and | ) | |
| SIX (6) WESTERN UNION MONEY | ) | |
| ORDERS WITH A TOTAL VALUE | ) | |
| OF $3,700.00 IN U.S. CURRENCY, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

This matter is before the Court on cross-motions for summary judgment. At issue is $94,200.00 in currency and six money orders with a total value of $3700.00 seized from Mr. Nuredin Sule during a traffic stop on February 14, 2011. The Government contends the money was either furnished or intended to be furnished in exchange for a controlled substance, or constitutes or was derived from proceeds traceable to unlawful activity. The Claimant Fatuma Salih, Mr. Sule's aunt, contends the money is hers and was obtained lawfully from employment and from selling a restaurant.[1]

**FACTS**

The proffered evidence establishes the following undisputed facts: On February 14, 2011, Detective Freddie Huff of the Lexington Police Department was monitoring traffic on

---

[1] Ms. Salih did not present any evidence in support of her motion for summary judgment. While her memorandum of law references various documents, none were filed with this court. However, most of those referenced documents were filed by the Government in support of its motion for summary judgment.

Interstate 85 South near mile marker ninety-three at approximately 4:00 pm. (Doc. 20-3, ¶ 3.) Detective Huff observed a Dodge Charger approach his position traveling sixty to sixty-five miles per hour. *Id.* Detective Huff exited the median to further observe the vehicle. *Id.*

Detective Huff pulled beside the Dodge Charger and observed the driver was very rigid and would not look in his direction. (Doc. 20-3, ¶ 4.) Detective Huff backed off the vehicle and observed the Dodge following another vehicle at a distance of less than one-half of a car length. *Id.* Detective Huff then initiated a traffic stop. *Id.* Detective Huff spoke to the driver, later identified as Nuredin Sule, advising him that he had been stopped for following too close. (Doc. 20-3, ¶ 5.) Detective Huff asked Mr. Sule for his driver's license and registration and noticed that Mr. Sule's hands were trembling when he complied. *Id.* Detective Huff observed an air freshener on the back seat of the vehicle along with a small suitcase. *Id.* Detective Huff asked Mr. Sule to come back to his patrol vehicle. *Id.* Mr. Sule was very polite and agreed. *Id.*

Detective Huff observed that Mr. Sule was breathing very heavily and rapidly. (Doc. 20-3, ¶ 6.) Mr. Sule was also restless and fidgety. *Id.* Detective Huff examined Mr. Sule's rental contract, which showed he rented the vehicle in Washington, D.C. that morning and was to turn in the vehicle at the Atlanta airport the next day. *Id.* Detective Huff asked Mr. Sule where he had been. (Doc. 20-3, ¶ 7.) Mr. Sule said he had left on Friday to visit his aunt in Maryland. *Id.* Mr. Sule said he had rented the vehicle in Washington to drive home to Lawrenceville, Georgia. *Id.* Mr. Sule stated he did this because he did not have to go to work until the following day and he had plenty of time. *Id.* Mr. Sule advised that he was employed as a pharmacist at Walgreens. *Id.* When asked what he did during his trip, Mr. Sule stated that he stayed with his aunt and went shopping. *Id.*

Detective Huff asked Mr. Sule why he was so nervous. (Doc. 20-3, ¶ 9.) Mr. Sule said he was not nervous; he just did not want a ticket. *Id.* Detective Huff gave Mr. Sule his license and returned the rental contract. *Id.* Detective Huff observed continued nervousness from Mr. Sule and noticed that Mr. Sule had sweat beading off his nose and forehead, even though the temperature was approximately 60 degrees. *Id.*

Detective Huff asked Mr. Sule if he could search the vehicle. (Doc. 20-3, ¶ 10.) Mr. Sule replied, "sure." *Id.* Mr. Sule walked up to the driver's side rear door, pulled out a Macy's shopping bag, and said "it's just clothes." *Id.* Detective Huff searched the trunk of the vehicle and found a comforter and a shopping bag containing hangers. *Id.*

Detective Huff opened the black suitcase from the back seat and observed a plastic grocery bag containing bulk currency. (Doc. 20-3, ¶ 11.) Detective Huff asked Mr. Sule about the currency and Mr. Sule stated, "it's my money." *Id.* Detective Huff asked Mr. Sule where the currency came from. *Id.* Mr. Sule repeated, "it's my money" and further stated, "I have a bank. I have a job." *Id.* Detective Huff asked Mr. Sule if he had any documentation for the money and Mr. Sule stated he had papers for the money in Atlanta. *Id.* Mr. Sule later stated that $40,000.00 of the currency came from his aunt and he had the rest in his pockets when he flew to Washington, D.C. *Id.* He said that the currency totaled $98,000.00. *Id.* Detective Huff observed that the currency was in six bundles, with each bundle rubber-banded together and wrapped in white paper, consistent with narcotics proceeds. *Id.* The suitcase also contained six Western Union money orders totaling $3700.00, as follows:

1) Serial No.: 14-232338239, dated December 3, 2010, in the amount of $900.00;
2) Serial No.: 14-232338240, dated December 3, 2010, in the amount of $800.00;
3) Serial No.: 14-115009358, dated December 15, 2010, in the amount of $500.00;

3

4) Serial No.: 14-115009359, dated December 15, 2010, in the amount of $500.00;
5) Serial No.: 14-115009360, dated December 15, 2010, in the amount of $500.00; and
6) Serial No.: 14-115009361, dated December 15, 2010, in the amount of $500.00.

*Id.* None of the money orders contained purchaser or payee information. *Id.*

Other than two cologne sets, no other recently purchased items were in the vehicle. *Id.* Mr. Sule was asked to give a statement about the currency. *Id.* He refused and stated he wanted a lawyer. *Id.*

The currency and money orders were placed back in the grocery bag, then in the suitcase; the suitcase was placed in a row with the shopping bag and the comforter that were found in the trunk of the vehicle. (Doc. 20-3, ¶ 12.) Detective Huff retrieved his narcotics detection canine, "Kiara," from his patrol vehicle to perform a canine sniff. *Id.* Detective Huff walked Kiara past the shopping bag, suitcase, and comforter. *Id.* Kiara alerted on the suitcase containing the currency and money orders.[2] *Id.* Detective Huff seized the currency and money orders. (Doc. 20-3, ¶ 16.)

The Drug Enforcement Agency adopted the seizure of the currency and money orders and began administrative forfeiture proceedings. (Doc. 20-2, ¶ 17.) On May 3, 2011, DEA received a claim to the defendant properties from Fatuma Salih. *Id.* In her administrative claim, Ms. Salih stated under oath that she was Mr. Sule's aunt and that the defendant property was hers, derived from the operation and sale of her restaurant, the Dire Dawa Ethiopian Restaurant, 2205 14th Street, NW, Washington, D.C. (Doc. 20-4 at pages 1-2.) As a result, the

---

[2] Detective Huff and Kiara have received extensive training and have been involved in numerous narcotics investigations. (Doc. 20-3, ¶¶ 13-15.) Since being placed into service, Kiara has reliably detected large amounts of narcotics, including, marijuana, heroin, powder cocaine, and crack cocaine. *Id.*

4

administrative forfeiture processes were terminated and the seizures were referred to the United States Attorney's Office for judicial forfeiture. (Doc. 20-2, ¶ 17.)

According to her sworn interrogatory answers, Ms. Salih worked several jobs in food service upon moving to the Washington, D.C. area in early 2000. (Doc. 20-17 at page 7.) Her federal tax returns show wage income in 2001 of $19,314, (Doc. 20-5 at page 1), wage income in 2002 of $16,071, (Doc. 20-6 at page 1), and wage income in 2004 of $7,792, (Doc. 20-7 at page 1). In her sworn Application for Naturalization to United States Department of Homeland Security, dated July 4, 2010, Ms. Salih stated that she owned and operated the Dire Dawa Restaurant at 2205 14th Street, NW, Washington, D.C. from approximately May 2004 to December 2007; she then moved the restaurant to Georgia Avenue and operated it there until January 2009. (Doc. 20-25 at page 6.) Her personal and business tax returns, including District of Columbia Sales & Use Tax returns, show the restaurant had minimal sales and generated little or no income, particularly in 2008 and 2009. (Doc. 20-8, 20-9, 20-10, 20-11, 20-12.)

The restaurant was the focus of a drug investigation in 2006 and 2007. (Doc. 20-16.) The record does not show that any charges were brought, and there is no admissible evidence before the Court that Ms. Salih was involved.[3]

Ms. Salih did not file tax returns for 2010. (Doc. 20-18 at page 4.) In her citizenship application she stated that she was a student, unemployed, with no income since February 12, 2009. (Doc. 20-25 at page 6.)

In her application for citizenship, Ms. Salih listed an address of 5009 5th Street, NW, Washington D.C., (Doc. 20-25 at page 5), though in answers to interrogatories she swore she

---

[3] There is an affidavit from a DEA Agent reporting unsworn statements of an anonymous person who says he bought drugs from Ms. Sulih and others at the restaurant, (Doc. 20-16), but this is hearsay and the court will not consider it. *See U.S. v. 524 Cheek Road,* 425 F. Supp. 2d 704, 708 n.3 (M.D.N.C. 2006).

moved to Maryland in 2007. (Doc. 20-17 at page 7.) The Government has proffered admissible evidence which Ms. Salih has not specifically disputed that she also rented an apartment in Takoma Park, Maryland and a private mailbox in College Park, Maryland, and that she received large amounts of illegal drugs at those locations in 2009 and 2010.[4]

Specifically, the Government's undisputed evidence shows that Ms. Salih has leased Apartment #606 at the Belford Towers Apartments, 6735 New Hampshire Avenue, Takoma Park, Maryland, since March 2009. (Doc. 20-21.) The lease lists a co-tenant, but the "co-tenant" and his wife purchased a home in Silver Spring, Maryland for $485,000 in February 2009 and attested they would occupy it as their personal residence. (Doc. 20-26.)

On September 10, 2009, a Customs and Border Protection Officer at the John F. Kennedy International Airport Mail Facility seized a shipment containing 4,880 grams of khat, a stimulant containing controlled substances, addressed to Fatuma Salih at 6735 New Hampshire Avenue, #606, Takoma Park, MD 20912. (Doc. 20-19.) The package was mailed from Nairobi, Kenya. *Id.*

On September 17, 2009, a Customs and Border Protection Officer at the John F. Kennedy International Airport Mail Facility seized a shipment containing 4,340 grams of khat addressed to Fatuma Salih at 6735 New Hampshire Avenue, #606, Tako (sic), MD 20912. (Doc. 20-20.) The package was mailed from Nairobi, Kenya. *Id.*

On December 14, 2009, Fatuma Salih rented mailbox #353 at The UPS Store located at 4423 Lehigh Road, College Park, MD, for a period of one year. (Doc. 20-22.) On July 15, 2010, a Customs and Border Protection Officer at the John F. Kennedy International Airport Mail

---

[4] Ms. Salih's general denial that the money was associated with drugs is insufficient to raise a disputed question of material fact concerning the specific drug transactions as to which the Government has proffered admissible evidence.

6

Facility seized a shipment containing 1,860 grams of khat addressed to Fatuma Salih at 4423 Leigh (sic) Road #353, College Park, MD 20740. (Doc. 20-23.) This package was mailed from Bolton, Great Britain. *Id.* On July 20, 2010, a Customs and Border Protection Officer at the John F. Kennedy International Airport Mail Facility seized a fourth package of khat addressed to Ms. Salih, this one containing 1,880 grams of khat and addressed to Fatuma Salih at 4423 Leigh (sic) Road #353, College Park, MD 20740. (Doc. 20-24.)

During the time Ms. Salih rented mailbox #353, she picked up packages on a regular basis. (Doc. 20-22, ¶ 4.) The manager of the UPS Store recalls that Ms. Salih picked up packages sent from England via Royal Mail. *Id.* Packages were generally delivered every few weeks; however, there were times when Ms. Salih would pick up packages on a more frequent basis. *Id.*

## PROCEDURAL HISTORY

This action was filed by the Plaintiff United States on July 29, 2011, for the forfeiture of $94,200.00 in United States currency and six Western Union money orders with a total value of $3,700.00 in United States currency. On September 1, 2011, Ms. Salih was served with the Verified Complaint of Forfeiture, Warrant for Arrest, and Legal Notice. (Doc. 7.) On September 13, 2011, she filed a Claim to the defendant properties and an Answer to the Complaint. (Doc. 9.) Fatuma Salih is the sole claimant to the defendant currency and money orders. Each party has now filed a motion for summary judgment.

## LAW AND ANALYSIS

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to

7

judgment as a matter of law." The party seeking summary judgment bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)).[5] The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

This same standard applies in civil forfeiture actions: summary judgment is appropriate when there is no genuine issue of material fact. *See, e.g., United States v. $864,400.00 in U.S. Currency*, 2009 WL 2171249, at *2 (M.D.N.C. July 20, 2009), *aff'd*, 2010 WL 5189543 (4th Cir. 2010); *United States v. $10,000.00 in U.S. Currency*, 348 F. Supp. 2d 612, 615-16 (M.D.N.C. 2004); *United States v. 3714 Cancun Loop*, 2002 WL 1035457, at *3 (M.D.N.C. May 17, 2002), *aff'd*, 50 F. App'x 139 (4th Cir. 2002).

The Civil Asset Forfeiture Act of 2000 ("CAFRA") governs, among other things, the forfeiture of assets "used to commit or facilitate the commission of a criminal offense." 18 U.S.C. § 983(c)(3) (2006). In such cases, the burden of proof is on the Government to establish, by a preponderance of the evidence, that (1) the property is subject to forfeiture, and (2) there was a substantial connection between the property and the offense. *Id.* at § 983(c)(1),(3); *see United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010); *United States v. Cherry*, 330 F.3d 658, 669-70 (4th Cir. 2003). CAFRA also provides, however, that "[a]n innocent owner's

---

[5] The language of Rule 56 was amended effective December 1, 2010; however, the substance of the rule did not change and the movant's burden remains the same.

8

interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1).

"The Government may rely on circumstantial evidence to establish forfeitability," *Herder*, 594 F.3d at 364, but the Court will look to "the totality of the circumstances to determine whether the Government has met its burden." *United States v. $864,400.00 in U.S. Currency*, 2009 U.S. Dist. LEXIS 61879 (M.D.N.C. July 20, 2009), *aff'd*, 405 F. App'x 717 (4th Cir. 2010); *see United States v. Thomas*, 913 F.2d 1111, 1115-17 (4th Cir. 1990). If the government satisfies its evidentiary burden, the "burden shifts to [the Claimant] to prove that [s]he is entitled to the property." *$864,400.00 in U.S. Currency*, 2009 U.S. Dist. LEXIS 61879; *see also 524 Cheek Road*, 425 F. Supp. 2d at 709. The Claimant's burden of proof is also by a preponderance of the evidence. *524 Cheek Road*, 425 F. Supp. 2d at 709.

The Government proffers two alternative grounds as support for its forfeiture claims: (1) pursuant to 21 U.S.C. § 881(a)(6) (2006), that the money was furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* (2006), or represents proceeds traceable to such an exchange; and (2) pursuant to 18 U.S.C. § 981(a)(1)(C) (2006), on the grounds that the defendant properties constitute or were derived from proceeds traceable to "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7) (2006), or a conspiracy to commit such offense. "Specified unlawful activity" means any one of a large variety of offenses including, as in this case, drug offenses. *See* 18 U.S.C. 1961(1)(A) (2006).

The Government contends that its evidence establishes that the money seized from Mr. Sule has a substantial connection to the sale of khat, a stimulant which contains Cathinone, a Schedule I controlled substance, and Cathine, a Schedule IV controlled substance. (Doc. 20-16,

9

¶ 3); *see* 21 U.S.C. § 812 (2006); 21 C.F.R. § 1308.11(f)(3) (2012); 21 C.F.R. § 1308.14(e)(1). Ms. Salih disputes this, contending that the canine alert is insufficient to establish that the money has any connection to drug dealing and that she has otherwise established that her income was sufficient to allow her to gather such a large amount of cash.

The Government has significantly more evidence than just a dog alert on cash. In addition, the Government has offered undisputed evidence that Mr. Sule was extremely nervous during the traffic stop and gave conflicting answers to questions about the money, and that Ms. Salih lived in a residence and otherwise received packages at two separate addresses to which large amounts of the controlled substance khat have been mailed. Ms. Salih's financial information, filed by the Government, shows that she made very little money from her restaurant. In 2009, her tax return showed business income of just over $5,000, and does not reflect the sale of the business. (Doc. 20-12.) According to her citizenship application, she was unemployed in 2010. (Doc. 20-25 at page 6.) Her verifiable income in 2009 and 2010, the two-year period immediately preceding the seizure, is not sufficient to cover her personal expenses, much less explain the accumulation of nearly $100,000.00. Taken together, this is strong circumstantial evidence that the money was proceeds from selling khat.

Ms. Salih's statement that she received the money from selling her restaurant, without supporting evidence, does not create a genuine issue of material fact.[6] She has provided no documentation of such a sale, nor has she provided any specific details of the sale, such as the

---

[6] The Government filed a copy of Ms. Salih's objection to the administrative forfeiture, which contained a sworn statement that "[t]his asset, cash in the amount of $94,200.00, is all the money that I legally received from the operation of and eventual sale of my restaurant, the Dire Dawa Ethiopian Restaurant, 2205 14th Street NW, Washington, DC 20009." (Doc. 20-4 at page 1-2.) She further stated that "this money has nothing at all to do with any kind of drugs." *Id.* She made similar statements about the money orders. (Doc. 20-4 at page 3-4.) She has offered no further evidence concerning the source of this money.

amount or date of the sale or the name of the purchaser. "The mere allegation of a highly unlikely legitimate source of income without some support to give the allegation credibility cannot constitute an issue of material fact defeating summary judgment for forfeiture." *United States v. $10,000 in U.S. Currency*, 348 F. Supp. 2d 612, 617 (M.D.N.C. 2004) (quoting *United States v. Two Parcels of Real Property*, 92 F.3d 1123, 1129 (11th Cir. 1996)); *see also United States v. $50,720 in U.S. Currency*, 589 F. Supp. 2d 582, 584 (E.D.N.C. 2008).

The Government has thus shown undisputed evidence which establishes by a preponderance of the evidence that there is a substantial connection between the money and the sale and distribution of the controlled substances Cathinone and Cathine, found in the stimulant khat. Ms. Salih has not established any defenses to the forfeiture. Therefore, the Government is entitled to summary judgment.

It is ORDERED that the Government's Motion for Summary Judgment (Doc. 19) is GRANTED and the Claimant's Motion for Summary Judgment (Doc. 17) is DENIED.

This 13th day of July, 2012.

_____
UNITED STATES DISTRICT JUDGE